# IN THE UNITED STATES DISTRICT COURT

# THE DISTRICT OF COLORADO

Civil Action No.

**EZEKEIAL ALIREZ,**

      Plaintiff;

v.

**UNIVERISTY OF NORTHERN COLORADO**;

**ANDREW FEINSTEIN**, individually and in his official capacity as *President of University of Northern Colorado* with the UNIVERISTY OF NORTHERN COLORADO

**CEDRICK HOWARD** individually and in his official capacity as *Vice President for Student Affairs and Enrollment Services* with the UNIVERISTY OF NORTHERN COLORADO

**LARRY LOFTEN**, individually and in his official capacity as *Title IX Investigator and Equity Officer* with the UNIVERISTY OF NORTHERN COLORADO

**SHANE BORAH**, individually and in his official capacity as *Senior Case Manager* with the UNIVERISTY OF NORTHERN COLORADO

**COLLEEN SONNENTAG**, individually, and in her official capacity as *Dean of Students*, with the UNIVERSITY OF NORTHERN COLORADO

      Defendants

I, CERRIDWYN NORDSTROM, AM A BLIND ATTORNEY. PLEASE EXCUSE TYPOS.

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff EZEKEIAL ALIREZ ("Mr. Alirez" or "Plaintiff"), hereby respectfully files this action against the above-captioned defendants, through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows.

## I.     NATURE OF THE CASE

This action seeks redress for violations of, and seeking redress under, federal law, including but not limited to the United States Constitution, 42 U.S.C. §§ 1983, 1985, 1988, and 2000d, for discriminatory conduct in a public education disciplinary setting, stemming from the use of self-defense in an unprovoked attack resulting in the suspension from school of only one Hispanic participant.

## II.     JURISDICTION AND VENUE

1.  Plaintiff Ezekeial Alirez is a resident of Weld County, Colorado.

2.  Defendant the University of Northern Colorado (herein "UNC" or "School") is a public University, serving approximately 9,800 students annually. Its principal place of business is located at 501 20th St, Greeley, Colorado 80639.

3.  Defendant Andrew Feinstein ("Mr. Feinstein") is the President of the University of Northern Colorado. On information and belief, Mr. Feinstein is a citizen and resident of Colorado.

4.  Defendant Cedrick Howard ("Mr. Howard") is the Vice President for Student Affairs and Enrollment Services at the University of Northern Colorado. On information and belief, Mr. Howard is a citizen and resident of Colorado.

5. Defendant Larry Loften ("Mr. Loften") is the Title IX Investigator and Equity Officer at the University of Northern Colorado. On information and belief, Mr. Loften is a citizen and resident of Colorado.

6. Defendant Shane Borah ("Mr. Borah") is the *Senior Case Manager* at the University of Northern Colorado. On information and belief, Mr. Borah is a citizen and resident of Colorado.

7. Defendant Colleen Sonnentag ("Ms. Sonnentag") is the Dean of Students at the University of Northern Colorado. On information and belief, Mrs. Sonnentag is a citizen and resident of Colorado.

8. The court has personal jurisdiction over the parties because Plaintiffs filed in this Court and because the Defendants are subject to general jurisdiction in Colorado or, alternatively, at a minimum for the specific conduct alleged herein occurring here.

9. The amount in controversy exceeds $75,000.00 for Plaintiffs claims.

10. The court has jurisdiction over this action pursuant to: (a) 28 U.S.C. § 1331 based on the federal question claims described below including but not limited to 42 U.S.C. § 2000 *et seq.* and 28 U.S.C. § 1332 because of the complete diversity of residences, citizenship, and domicile between the plaintiffs and defendants in this action and amount in controversy exceeding $75,000.00, not including interest and costs. The Court's exercise of jurisdiction in this matter would satisfy the Due Process Clause of the Fourteenth Amendment.

11. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b), pursuant to subsections 1 and 2, based on the residences of the defendants and/or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurring in Weld, Colorado.

### III. BACKGROUND FACTS

12.  Mr. Alirez is a Latino man.

13.  During his time at UNC, Mr. Alirez was an exemplary student and athlete.

14.  During the final semester of Mr. Alirez's senior year, he was involved in an altercation in which Mr. Alirez responded in self-defense.

15.  On April 23, 2022, Mr. Alirez had been volunteering at a student event, and afterwards went out for a few drinks with his friends.

16.  At about midnight, Mr. Alirez and his friends were at the Cubetas bar in downtown Greeley. About 10 minutes after they arrived at Cubetas, a large fight broke out in the parking lot of the bar. Mr. Alirez and his friends decided to leave to avoid the commotion.

17.  As they left the bar, Mr. Alirez and his friends witnessed security macing and tasing individuals involved in the fight. One of Mr. Alirez's friends was inadvertently maced as they attempted to avoid the altercation, and there were unconscious bodies of individuals involved in the altercation strewn around the parking lot. Mr. Alirez, who did know if the individuals were unconscious or dead, was reasonably fearful of the situation and wanted to get away from the continuing altercation.

18.  As Mr. Alirez moved through the parking lot, he heard a girl screaming for help as a man nearby was being assaulted. Mr. Alirez attempted to pull the assailant off the man, at which point the man hit Mr. Alirez in the face.

19.  In self-defense, Mr. Alirez responded by hitting the man back and pushing him off. However, even after falling to the ground, the man continued to attack Mr. Alirez and attempted to climb up Mr. Alirez's legs, at which point Mr. Alirez kicked the man off

him and once the man was no longer clawing at him, Mr. Alirez was able to get away from the altercation.

20. There was no police presence and Mr. Alirez was not charged with any crime.

21. UNC received an anonymous complaint several days later, which included dark, blurry footage of many people fighting and ended with Mr. Alirez and his friends helping the man being assaulted. UNC also received a false accusation that Mr. Alirez had instigated the altercation and harmed multiple people.

22. On April 27, 2022, UNC issued an interim suspension against Mr. Alirez. This suspension was enforced immediately. This suspension resulted in Mr. Alirez being banned from campus over finals week, and explicitly prohibited Mr. Alirez from completing any of his finals in person or over email, or otherwise submitting them online.

23. On May 2, 2022, Mr. Alirez was "interviewed" by Shane Borah, ("Mr. Borah") a case manager for the UNC at an informal meeting. This "meeting" was actually a hearing, at which under UNC's policy Mr. Alirez had a right to provide witness testimony and other evidence. However, this information was not provided to Mr. Alirez ahead of the hearing.

24. During the meeting, when asked if he was the person in the video, Mr. Alirez was honest with Mr. Borah, and told him that he was one of the individuals in the video. However, when he tried to explain the situation, he was immediately shut down and not allowed to defend his actions or his attempt to help the man being assaulted.

25. Mr. Alirez told Mr. Borah that he had witnesses who could explain the situation, but Mr. Alirez was told that if he brought forward more evidence it would prolong the investigation, and guaranteed Mr. Alirez would be prohibited from participating in graduation or being able to walk at the graduation ceremony.

26. Mr. Alirez was bullied and intimidated by Mr. Borah to not submit evidence to defend himself. Mr. Borah made it clear that the only way Mr. Alirez would be able to walk at graduation was to accept whatever punishment UNC decided and not attempt to defend himself.

27. On May 3,  2020, Mr. Alirez's dad reached out to Cedrick Howard, ("Mr. Howard") Vice President of UNC. Mr. Howard was upset about how Mr. Borah had threatened Mr. Alirez with not participating in graduation if he submitted documentation to corroborate the events of April 23rd.

28. The same day, Mr. Alirez received an email from Mr. Borah apologizing for telling Mr. Alirez not to submit witness evidence from the incident. Mr. Alirez responded that he would like to provide more evidence and Mr. Borah gave Mr. Alirez until May 6th at noon to submit.

29. Because Mr. Alirez was given less than three days to provide witness statements, Mr. Alirez was only able to submit seven statements, including a statement from the man Mr. Alirez had helped.

30. Mr. Alirez was later able to receive a statement from both Enrique Benavidez, UNC's then student body president, and the owner of the bar. Both corroborated Mr. Alirez's statement of events, and the bar owner was able to verify this incident from multiple employee reports as well as numerous cameras located inside and outside of the bar. However, because Mr. Alirez could not provide them within the three-day deadline, these were not considered by Mr. Borah or the Deans office at UNC.

31. On May 6, 2022, Mr. Alirez, received an email from Mr. Borah, informing Mr. Alirez that Mr. Borah had received the statements, that Mr. Alirez would not be permitted to walk at graduation, and that he was prohibited from coming on campus.

32. On May 16, 2022, Mr. Alirez received an official document from Mr. Borah stating that Mr. Alirez would be suspended for 2 years, through Spring of 2024, and would be required to seek professional counseling and write a research paper regarding the proper de-escalation of an altercation. Mr. Alirez was also provided with an indefinite no-trespass order from all UNC properties.

33. The letter also stated that Mr. Alirez's ability to return to campus requires him to petition for reentry, that reentry is dependent on UNC's determination that he had effectively completed all requirements, and that Mr. Alirez's readmittance to the university is in no way automatic or guaranteed.

34. In the event that he is allowed to return, he would also have to recomplete his final semester, even though he was not initially suspended until the week of finals, and he will not receive a diploma until he recompletes his semester. The uncertainty of a definitive ending of Mr. Alirez's suspension results in it being *de facto* an expulsion and withholding of his degree.

35. The UNC code of conduct requires only a preponderance of the evidence standard. The hearing decision stated that Mr. Alirez had violated University Regulations 3-2-204(1) Physical Injury/Endangerment, 3-2-204(3) Threatening Behaviors, and 3-2-204(22) Violation of Statute.

36. Mr. Borah stated that Mr. Alirez engaged in conduct that had the purpose of causing physical injury or harm to another person, that these actions were intended to intimidate

or cause physical harm to a person, and that Mr. Alirez's action violated C.R.S. Section 18-3-204(1)(a) by knowingly or recklessly causing bodily injury to another person. Though eyewitness testimony of sever people contradicted this finding, Mr. Borah relied heavily on the partially obstructed video which did not provide a full view of the incident. There is no evidence of bodily injury, nor was Mr. Alirez ever criminally charged with anything, let alone convicted.

37. The reasoning provided by Mr. Borah in the determination was that the several-second video was more likely accurate than the seven witness statements Mr. Alirez provided. However, the video does not provide a clear image of the beginning of the altercation, with both a car and multiple other people blocking the cameras view of Mr. Alirez's actions, and therefore did not provide compelling evidence that Mr. Alirez instigated the fight or breached university policy.

38. Instead, even with the obstructed view the video only corroborates what Mr. Alirez and his seven witnesses accounted from the altercation.

39. Though Mr. Alirez was not arrested nor facing any criminal convictions for the action, Mr. Borah stated that he found "it more likely than not that your actions of punching and kicking do not constitute the use of physical force in order to defend yourself under C.R.S. 18-1-704"; however no analysis of self-defense under C.R.S. 18-1-704 was conducted. This assumption is not corroborated on the video.

40. On May 18, 2022, Mr. Alirez submitted an appeal to the decision, arguing that he was not allowed due process because of the coercion by Mr. Borah to pressure Mr. Alirez into not submitting witness statements, and that the 2-year suspension was extraneously severe considering Mr. Alirez's act of helping a person in need.

41. On May 24, 2022, Mr. Alirez filed a discrimination claim with UNC's Title IX office.

42. On July 7, 2022, Mr. Alirez received a determination from the Title IX office of discrimination not found.

43. On July 25, 2022, Mr. Alirez's appeal was denied.

44. The notice denying Mr. Alirez's appeal claimed that Mr. Alirez was provided with sufficient due process, even with the short period he was given to supply witness statements. However, this determination ignores the time constraint of Mr. Alirez walking at graduation ceremony, and the ultimatum from Mr. Borah that if Mr. Alirez provided information he would not walk.

45. Because not participating in graduation was threatened as a consequence of taking the time needed to gather statements and evidence, Mr. Alirez was pressured to only provide what he could by the two-and-a-half-day deadline.

46. The appeal denial stated that because Mr. Borah allowed evidence to be submitted after the hearing that this evidence is hearing evidence, and not additional evidence, so UNC disregarded it. However, it was never made clear to Mr. Alirez that this evidence would be considered along with his statement from the original meeting, nor that he had the opportunity for witnesses to present at a hearing instead of just providing witness statements. The hearing was called a "meeting" up until the determination notice, which did not provide Mr. Alirez with sufficient notice of the universities process.

47. As a result, it is clear that UNC would not revisit whether Mr. Alirez had been wrongfully suspended from the university.

48. Mr. Alirez is being retaliated against because of his complaint of race discrimination and report of intimidation to Mr. Howard from Mr. Borah.

49. Under 3-2-202 (3) of the BEAR Code the Dean of student has the authority and discretion to determine, on a case-by-case basis if the BEAR Code shall be applied to off-campus misconduct. The BEAR Code defines the Dean of Students ("DOS") as "the UNC employee who is directly responsible for Student disciplinary matters, regardless of the title of the employee's position. The Dean of Students, in their discretion, may designate other UNC employees to perform the duties and responsibilities of the DOS as described in the BEAR Code."

50. Therefore, Mr. Borah as a DOS designee had discretion to not enforce the BEAR Code to this incident, or the severity of punishment to inflict on Mr. Alirez. He chose to enforce the code with one of the most severe penalties anyways.

51. The punishment imposed on Mr. Alirez by UNC is inequitable considering the weight of evidence showing that the Mr. Alirez acted selflessly in a situation that was very serious and potentially life threatening. Though Mr. Alirez's determination does not list the penalty of his degree being withheld, the sanctions he has received have still resulted in that penalty, as his degree has been effectively withheld until 2024, if not indefinitely. However, instead of being commended for risking his own safety to help another person, the university is penalizing him.

52. Now, Mr. Alirez has lost over $100,000 in tuition and the opportunity to graduate from UNC program which he had worked for years to achieve. Stripping Mr. Alirez of the opportunity to receive his diploma has also resulted in job offers being rescinded and Mr. Alirez has been forced to look for employment not requiring a college degree.

### III.   CLAIMS AND CAUSES OF ACTION

## A.  FIRST CLAIM FOR RELIEF

## (CLAIM FOR RACE- BASED DISCRIMINATION PURSUANT TO

## 42 U.S.C. § 1981

53. Plaintiff reincorporates and reallege all other paragraphs as if fully set forth herein.

54.  42 U.S.C. § 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

55. To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.). *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

56. To state a claim under § 1981, a plaintiff must identify the actual loss of a contract. *Shawl v. Dillard's Inc.*, 17 Fed. Appx. 908, 911 (10th Cir. 2001).

57. A university's decision to expel a student "is tantamount to the termination of that contract because it deprived plaintiff of the enjoyment of the 'benefits, privileges, terms,

and conditions of the contractual relationship.' 42 U.S.C. § 1981(b)." *Williams v. Lindenwood University*, 288 F.3d 349, 357 (8th Cir. 2002).

58. To prove intentional discrimination under § 1981, a plaintiff may employ a cat's paw theory of discrimination in which decision-makers act to dismiss a student based on racially discriminatory accusations without proper investigation. *Sirpal v. University of Miami*, 684 F.Supp.2d 1349, 1356-59 (S.D.Fl. 2010).

59. Damages claims for violations of § 1981 by state actors are brought under § 1983. *Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1137 (10th Cir. 2006).

60. The Plaintiff is male and a racial minority of Latino descent. Defendants were aware of Plaintiff's racial background.

61. Plaintiff's payment of tuition and attendance and enrollments at the School constituted a contract incorporating the various policies put in place by the School, as well as the Student Handbook.

62. Defendants, after a sham investigation pursuant to their Student Handbook roles, ultimately expelled the Plaintiff from the School. Defendants expelled the Plaintiff specifically because of his racial background.

63. Defendants heavily relied on the accuser's biased assertion that the Plaintiff was the instigator of the fight because he was in the vicinity of the altercation taking place and trying to help an individual being injured. By relying heavily on the accuser's racially biased assertion, the Defendants' actions against the Plaintiff were racially motivated and discriminatory.

64. Given how the evidence in this matter overwhelmingly supports the conclusion that the Plaintiff did not engage in any wrongful conduct nor instigated the fight, the Defendants

did not have a nondiscriminatory reason for expelling the Plaintiff and denying him of education, housing, and food.

65. The inadequacy of Defendants' investigation and the paucity of evidence supporting the investigation's conclusion demonstrates that the non-discriminatory reasons offered by Defendants to support expulsion of the Plaintiff are pretext for intentional race discrimination.

66. On information and belief, students of Caucasian backgrounds in positions similar to that of Plaintiffs in Student Code violation investigations at the school have been treated differently by the School. Caucasian students in student code investigations have been subject to dissimilar, less-severe punishments, pains, penalties, and sanctions.

67. As the investigator, Defendant Shane Borah intentionally discriminated against the Plaintiff on the basis of race by accepting the accuser's racially biased accusations.

68. The inadequacy of the investigation conducted by Defendant Shane Borah demonstrate that the non-discriminatory reasons offered for the Plaintiffs expulsions are mere pretext for impermissible race discrimination.

69. Defendant Shane Borah, as Designated Senior Case Manager, signed the expulsion letter that terminated the Plaintiff's contract with the college.

70. Defendant Shane Borah, by signing off on the expulsion based on the investigation intentionally discriminated against the Plaintiff on the basis of race due to the impermissible racial animus adopted by the investigation.

71. Defendants violated clearly established law.

72. At the time of the Plaintiff's expulsion, clearly established law existed that § 1981 prohibits intentional race discrimination including intentional discrimination that occurs

after the formation of the contract, including termination of the contract. *Perry v. Woodward*, 199 F.3d 1126, 1131-34 (10th Cir. 1999).

73. The Plaintiff's expulsions deprived him of the loss of the use, enjoyment, and benefit of their Enrollment Agreements. The expulsions deprived the Plaintiff of: educational enrichment; various School-provided educational resources to facilitate the learning process such as fifteen-to-one student-to-faculty ratios; School-based athletic event participation; School-provided Residence Life, including but not limited to environments conductive to the creation of respectful and supportive learning communities in residence halls; various School- sponsored academic, financial, and technology resources; and all other aspects of a normal student's educational career at the School.

74. The discrimination identified above caused the Plaintiff damages, including but not limited to the loss of the use, enjoyment, and benefit of his enrollments with the School.

## B.   SECOND CLAIM FOR RELEIF

## CLAIM FOR RACE- BASED DISCRIMINATION AND REATLIATION IN VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964- ALL DEFENDANTS

75. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

76. Plaintiff is male and a racial minority of Latino descent. Defendants were aware of Plaintiffs' racial background.

77. At all relevant times to this Complaint, Defendants acted pursuant to their University policies to investigate violations of the student code.

78. Defendants, after a sham investigation, ultimately indefinitely suspended the Plaintiff from the School. Defendants treated Plaintiff more harshly and suspended Plaintiff specifically because of his racial background.

79. Defendants explicitly stated that Plaintiff's accounting of events was less credible than the reports and obstructed video they received, without reason. Defendants also heavily relied on the accuser's assertion that Plaintiff started the fight merely because he was in the vicinity of the altercation. Of the multiple students involved in the fight, the Plaintiff was the only student who was indefinitely suspended.

80. After Plaintiff complained to Mr. Howard that he was being racially discriminated against by Mr. Borah, Plaintiff's assertion of self-defense was preliminary discarded, showing Defendants' actions against the Plaintiffs were racially motivated and discriminatory.

81. Given how the evidence in this matter overwhelmingly supported a conclusion that the Plaintiff did not engage in any wrongful conduct and was acting in self-defense, the Defendants did not have a nondiscriminatory reason for indefinitely suspending the Plaintiff and denying him of his education.

82. The inadequacy of Defendants' investigation and the paucity of evidence supporting the investigation's conclusion demonstrates that the non-discriminatory reasons offered by Defendants to support indefinite suspension of plaintiff are pretext for intentional race discrimination.

83. On information and belief, students of Caucasian backgrounds in positions similar to that of Plaintiff at the University have been treated differently by the School. Caucasian students in self-defense and defense of other investigations have been subject to

dissimilar, less-severe punishments, pains, penalties, and sanctions. Caucasian students' assertions of self-defense and defense of others have also been provided more weight in previous investigations.

84. As the investigators, Defendants Larry Loften and Shane Borah intentionally discriminated against Plaintiffs on the basis of race by discrediting Plaintiffs account of events and arbitrarily determining that he and his witnesses were less credible than the anonymous reporter.

85. The inadequacy of the investigation conducted by Defendants Larry Loften and Shane Borah demonstrate that the non-discriminatory reasons offered for Plaintiffs' expulsions are mere pretext for impermissible race discrimination.

86. Defendant Shane Borah, by signing off on the indefinite suspension based on the investigation intentionally discriminated against Plaintiff on the basis of race due to the impermissible racial animus adopted by the investigation.

87. Defendants violated clearly established law.

88. The discrimination identified above caused plaintiff damages, including but not limited to the loss of the employment, agency accreditation, and his degree.

## C. <u>THIRD CLAIM FOR RELIEF</u>

## 42 U.S.C. § 1983 FOR VIOLATION OF CONSTITUTIONAL RIGHTS – AGAINST ALL DEFENDANTS

45. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

46. 42 U.S.C. § 1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of

Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress..."

47. Plaintiff is a citizen of the United States and Defendants are persons for the purposes of 42 U.S.C. § 1983.

48. At all relevant times Defendants were acting under the color of state law in their capacity as employees at a public university.

49. As the alleged conduct occurred during school hours, Defendants' acts were conducted within the scope of their employment.

50. As a state actor, the school is subject to the Constitutional requirements of the First and Fourteenth Amendments to the United States Constitution.

51. The First Amendment provides that "Congress shall make no law...abridging the freedom of speech..." U.S. Const. Amend. I.

52. It is well established law in the Tenth Circuit that students in public education settings "do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996)(quoting *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 509 (1969)).

53. In order to restrict a student's speech in situations not involving school sponsored speech, the speech must "'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Id*.

54. A student's right to bring complaints to the appropriate persons in a public-school setting is well established in the Tenth Circuit. *Id*.

55. It is well established law in the Tenth Circuit that a prior restraint on speech "restricts speech in advance on the basis of content and carries a presumption of unconstitutionality." *Taylor v. Roswell Independent School Dist.*, 713 F.3d 25, 42 (10th Cir. 2013).

56. Defendant Mr. Borah's command to Plaintiff not to submit evidence refuting the accusations against him is a prior restraint on Plaintiff's speech.

57. Defendant Mr. Borah's further threat that Plaintiff would be prohibited from participating in graduation if he submitted evidence contradicting the accusation against him, was a prior restraint on Plaintiff's speech.

58. As demonstrated by his signature in the letter and the authority granted to him by the school, Mr. Borah's is a final policymaker of the school with respect to the directive to Plaintiff not to provide further evidence of plaintiff's innocence.

59. As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of his Constitutional rights and suffered other damages including emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

60. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1983, pre-judgment interest, and costs as allowable by federal law.

61. Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

### D.  FOURTH CLAIM FOR RELIEF

**(DECLARATORY JUDGEMENT AND INJUCNTIVE RELEIF-**

**ALL DEFENDANTS)**

89.  Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

90. The school breached the terms of the Enrollment Agreement with the Plaintiff.

91. The School's actions in this matter violate Title IV of the Civil Rights Act of 1964.

92. The parties have a dispute about whether the school acted in breach of its contractual obligations under the Enrollment Agreement and whether it is in violation of Section 1981.

93. The School's continued action against the Plaintiff has caused and are continuing to cause substantial, immediate, and continuing damages, including but not limited to lost educational opportunities and future lost wages.

94. Expulsion from the School has caused the Plaintiff to be denied the benefits of education at his chosen school and his participation in extracurricular school-sponsored activities, is affecting his ability to reenroll at other institutions of higher education, has damaged his academic and professional reputation, and has damaged his abilities to pursue his career in teaching.

95. As outlined above, the Plaintiff has demonstrated a substantial likelihood of success on the merits with respect to his Section 1981 breach of contract claims.

96. The school's conduct caused and will continue to cause the Plaintiff irreparable injury in the loss of educational opportunities, the prohibition of transferring to partake in other educational opportunities, and the loss of future wages and enjoyment of life, liberty, and pursuit of happiness. Due to the factual allegations described above, monetary damages alone cannot compensate the Plaintiff fully for the harms suffered. Economic damages

and lost future earnings may be difficult to quantify. He will never get these lost-education years back and may never realize the economic gains lost from his lack of participation in the workforce.

97. The grant of injunctive relief exposes no harm to the School. They are prohibited from disclosure except upon the limited exceptions as outlined in the FERPA. The educational disciplinary records contemplated in this request are already kept confidential by the School. However, the Plaintiff seeks the prohibition of disclosure of these records to afford him the opportunity to transfer to other educational institutions if not restored to the position he was in prior to the conduct alleged above. The disciplinary records serve a substantial bar to his admissions to other institutions of higher learning.

98. For the same reasons, granting injunctive relief will not disserve the public interest. On the other hand, the injunctive relief requested serves the public interest as outlined in the FERPA.

99. Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure Rule 57, the Plaintiff seeks declaratory judgment in his favor and against the School on the Civil Rights Act of 1983 claims and breach of contract claims above during the pendency of the determination of the economic claims. Such a determination would serve a useful purpose in clarifying and settling legal relations in issue and will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to this proceeding.

100.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure Rule 65, the Plaintiff requests an injunction immediately restoring him as a student in good standing at the School, prohibiting disclosure of their

educational disciplinary records to other schools at which he may apply, and clearing his

educational disciplinary records. No other remedy at law permits the Plaintiff to mitigate

adequately his damages and stem the tide of continuing and further harm. For the reasons

described above, the Plaintiff has a substantial likelihood of success on the merits on the

Civil Rights Act of 1983 claims and Section 1981 breach of contract claims, a substantial

threat exists that he will suffer irreparable injury if the injunction is not granted, the

threatened injury to him outweighs the harm on the School, and granting the injunction

will not disserve the public interest.

## V. DAMAGES

101.        The University's discriminatory and retaliatory conduct described above, and that
of the individual defendants, has caused the Plaintiff the following damages:

1.  Lost front pay, future wages, and benefits in amounts to be established at trial;
2.  Lost education opportunities;
3.  Lost educational opportunity cost in amounts to be established at trial;
4.  Emotional upset, stress, and anxiety in an amount to be established at trial;
5.  Out-of-pocket expenses, litigation costs, and attorney fees in amounts to be
    established at trial.

IV.     Defendant's violation of Title VII was willful, entitling the Plaintiff to an award
        of punitive damages to the fullest extent permitted by law.

## VI. REQUEST FOR RELIEF

Plaintiff requests that the Court enter judgment in their favor and against Defendants as follows:

1.  Awarding Plaintiff special damages for lost and anticipated wages, benefits, and out-of-
    pocket expenses in amounts to be established at trial;
2.  Awarding Plaintiff general damages for emotional distress in an amount to be established
    at trial;
3.  Punitive damages, pursuant to, 42 U.S.C. §§ 1983, 1985, 1988, and 2000d in the
    maximum amount permitted by law as applied to each Defendant;

4. Awarding Plaintiff reinstatement;
5. Awarding Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action under 42 U.S.C. §§ 1983, 1985, 1988, and 2000(d);
6. Awarding Plaintiff prejudgment interest on lost wages award and economic loss; and
7. Awarding Plaintiff any additional and further relief that the court finds equitable, appropriate, or just.

DATED: January 19, 2023

/s/ Cerridwyn Nordstrom,                        January 19, 2023
Cerridwyn Nordstrom, Esq.                       Date